# Affidavit in Support of a Criminal Complaint

I, R. David Collins, being first duly sworn, hereby depose and state as follows:

1. I make this affidavit in support of a Complaint charging Mohamed Fathy Suliman with attempting to provide material support or resources to a designated foreign terrorist organization; to wit: ISIS - in violation of 18 U.S.C. 2339B, between on or about June 12, 2014 and on or about June 14, 2014, in the Northern District of Florida and elsewhere.

2. I am a Special Agent with the Federal Bureau of Investigation (FBI), and have been employed as a federal investigator for 15 years. As a Special Agent with the FBI, my duties include the investigation of alleged violations of federal criminal laws, including terrorism offenses.

3. The information contained in the affidavit comes from my personal observations, my training and experience, and information provided to me by other law enforcement officers who have participated in this investigation. This affidavit is intended to articulate sufficient probable cause to support charges in the complaint and does not represent all of the information and evidence gathered in this case.

4. Title 18, United States Code, Section 2339B, prohibits, in pertinent part, a person from knowingly providing material support or resources to a foreign terrorist organization, or attempting or conspiring to do the same.

5. The term "material support or resources" means any "property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communication equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals, who may include oneself), and transportation, except medicine or religious materials."

6. On October 15, 2004, the United States Secretary of State designated al-Qa'ida in Iraq (AQI), then known as Jam'at al Tawhid wa' al-Jihad, as a Foreign Terrorist Organization (FTO) under Section 219 of the Immigration and Nationality



Act and as a Specially Designated Global Terrorist entity under section 1(b) of Executive Order 13224.

7. On May 15, 2014, the Secretary of State amended the designation of AQI as an FTO under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section 1(b) of Executive Order 13224 to add the alias Islamic State of Iraq and the Levant (ISIL) as its primary name. The Secretary also added the following aliases to the FTO listing: the Islamic State of Iraq and Syria, ad-Dawla al-Islamiyya fi al-'Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and Al-Furqan Establishment for Media Production. On September 21, 2015, the Secretary added the following aliases to the FTO listing: Islamic State, ISIL, and ISIS (herein collectively ISIS). To date, ISIS remains a designated FTO.

8. At all times relevant to the current charge, there was a conflict in Syria, with multiple groups engaged in violent, armed fighting. The groups included supporters of the Syrian government, secular rebels, and jihadist[1] groups, some of which were designated FTOs. Foreign fighters, some of whom were not citizens or residents of Syria and Iraq, were traveling to Syria and Iraq to join ISIS and commonly entered Syria by crossing the border from Turkey. In my training and experience, foreign fighters from Western countries travel to locations in Turkey, including Istanbul, and then travel to towns closer to the border where they are brought into Syria to join ISIS, or another FTO. Based on my training and experience, ISIS and its supporters often refer to their territory as the "Caliphate," and their leader as the "Khalifa," or similar names.

## Background

9. Suliman is a 33 year-old male and a United States citizen who was born in Washington D.C. At various times in his life, Suliman has resided both overseas and in the United States (and appears to have resided in Florida for the majority of his life). He is currently residing overseas.

---

[1] "Jihad" is an Arabic word that literally means striving or struggling, but in the context of ISIS (and other FTO) supporters, is commonly used to refer to a holy war, fight, or struggle against the enemies of Islam. A "jihadi" or "jihadist" is one who engages in jihad (i.e., fights on behalf of such terrorist organizations). Your affiant uses these terms in this context.

2

## Probable Cause

10. Based on evidence gathered during the course of this investigation and contained herein, your affiant believes that between February 2009 and June 2014, Suliman sought to support violent jihad by traveling to areas of conflict in an effort to provide material support (including himself, as personnel, and services) to terrorist organizations.

11. Pursuant to a search warrant authorized by a Magistrate Judge in this District, a search of an email account (a Gmail account), which was subscribed to by Suliman, was conducted. The searched revealed that between May 2009 and October 2012, Suliman had approximately 36 email attachments that contained various audio files that consisted of messages calling for jihad, justifications for jihad, rewards for those who participate in jihad and martyrdom, and that encouraged fighting against the crusaders, infidels (non-Muslims), and those that insult the Prophet Muhammad.

12. During the course of this investigation, your affiant became aware of an email account that Suliman had used at a university in Florida (i.e., a personal email account that ended in ".edu"). Further investigation revealed that this email account was linked to a Facebook account that was used by Suliman. Your affiant observed Suliman's Facebook account in both August and December of 2014 and on both occasions the Facebook account displayed an ISIS profile photo featuring the black flag that is ISIS's symbol. Also, when your affiant interviewed Suliman in Sudan on October 23, 2018, Suliman told your affiant that he created his Facebook account with the aforementioned ".edu" email address. Your affiant learned that Suliman had opened a second Facebook account. Records obtained from Facebook revealed that the registered email account for Suliman's second Facebook account is Suliman's aforementioned Gmail account. Facebook records revealed that Suliman's second Facebook account was created on or about June 30, 2014, and was accessed on or about July 8, 2014, from an Internet Protocol (IP) address located in Sudan.

13. On August 16 and 17, 2011, Suliman was interviewed by the FBI at the U.S. Consulate Office in Istanbul, Turkey after he attempted to fly from Turkey to New York. Turkish Airlines directed Suliman to the U.S. Consulate Office where he agreed to a non-custodial interview. When asked why he

3

thought his travel to New York had been disrupted, Suliman suggested it had to do with his detention in Somalia in 2009, when he attempted to enter Somalia, was detained, and was accused of being a foreign fighter entering Somalia to join the FTO known as al-Shabaab, which operates in Somalia.[2] Suliman explained that he had some mental health issues, specifically a bi-polar disorder. He said that when he was not taking his medication, he was often manic or depressed. He said that, in July 2009, he stopped taking his medication, traveled to Somalia through Dubai, and paid cash for tickets on a regional carrier which took him to Djibouti, then to Mogadishu, Somalia.

14. On or about June 9, 2016, and in response to a Mutual Legal Assistance Treaty (MLAT) request, the Department of Justice received a packet of documents from the Government of Turkey. The documents reflect that Mohamed Fathy Suliman, born June 25, 1987, was arrested on June 14, 2014, at 11:30pm for illegally crossing into Syria from Turkey between border stones 501 and 502, 100 meters west of the East-5 watchtower in Kilis Province, Turkey. Suliman was in possession of a GSM (Global System for Communication) phone.[3] Suliman was fingerprinted, his U.S. passport was photographed and he was interviewed. During the interview, Suliman stated that he traveled from the U.S. to Turkey, and that he flew to Gaziantep, Turkey and stayed at a hotel (that he identified by name). Suliman said that he asked individuals at the hotel how he could travel to Syria. He said that he was instructed to take a bus, and that he took a bus to Erbeyli. Suliman claimed the purpose of his travel to Syria was to see how life and war were there and also to travel. Suliman was fined $2,000 Turkish Liras and deported from Turkey to Sudan on June 19, 2014, as he had requested to go to Sudan. To date, Suliman has not returned to the United States.

15. A review of Turkish Airline records indicated that, on June 9, 2014, Mohamed Suliman made a flight reservation through a New York travel agency. On June 10, 2014, the airline ticket was issued. The airline ticket was for a one-way trip that originated in Orlando, Florida, went through Chicago, Illinois, and Turkey, and had a final destination of Alexandria, Egypt. The one-way ticket was

---

[2] Al-Shabaab also was (and is) designated as an FTO by the Secretary of State.
[3] A GSM activated phone can be used to access the internet with or without a cellular connection through a wifi service. Absent a wifi connection, it can be used to access the internet through a cellular connection or data plan.

4

purchased using a visa credit card subscribed to by Suliman. The total cost of the ticket was $1,142.49.

16. On June 12, 2014, Suliman initiated his travel on the ticket from Orlando, Florida to Chicago, Illinois on United Airlines flight 0540. Suliman connected to another flight in Chicago and departed on Turkish Airlines flight 0006 enroute to Istanbul, Turkey. Suliman's Egypt Air frequent flyer number was included on his ticket for this flight. Once he arrived in Istanbul, Turkey, Suliman was supposed to connect flights and take Turkish Airlines flight 0696 from Istanbul to Alexandria, Egypt. However, Suliman did not take this flight.

17. Your affiant has learned that when Suliman arrived in Istanbul, Turkey, rather than traveling on to Egypt, Suliman paid cash for a one-way business class airline ticket on Turkish Airlines flight 2236 from Istanbul to the Turkish/Syrian border town of Gaziantep, Turkey. Suliman purchased the ticket from the Gama Tourism desk located on the departure level of the airport in Turkey. The ticket was in the name of Mohamed Fathy Suliman, a slight difference from his original airline ticket from the United States where he used only his first and last name. Suliman listed the same aforementioned Egypt Air frequent flyer number for his ticket to Gaziantep (your affiant has confirmed that the frequent flyer number matches the number separately included on Suliman's ticket to Turkey). Turkish Airlines flight 2236 departed Istanbul, Turkey on June 14, 2014.

18. As indicated above, on June 14, 2014, Suliman was arrested by Turkish authorities for illegally crossing into Syria from Turkey. After his release from Turkish custody, on June 19, 2014, Suliman flew on a one-way flight (on that same date) from Gaziantep, Turkey to Khartoum, Sudan with a connection in Istanbul, Turkey. The airfare was paid in cash. The flight from Gaziantep was Turkish Airlines flight# 2223 and the flight from Istanbul to Khartoum was Turkish Airlines flight # 0680. The ticket was in the name of Mohamed Fathy Suliman. According to the records obtained from Turkish Airlines, Suliman's flight from Gaziantep to Khartoum was a deportation, which corresponds to the information provided by the Government of Turkey in response to the MLAT request.

19. A review of Suliman's Wells Fargo bank account reveals that Suliman made a cash withdrawal of $1,000 four days before he travelled to enter Syria. As described in this affidavit, Suliman used this cash to purchase the ticket to Gaziantep from Istanbul, meals and lodging, and the GSM card, among other things.

20. On or about June 14, 2014, Suliman received an email from an individual hereinafter referred to as Relative One. The subject line of the email read, "I know you left the country just call us." In substance, the writer of the email stated that they learned Suliman was in Turkey and could not believe how his mind worked, to leave his wife and mother. The writer explained they didn't care what he wanted to do anymore or how they wanted him to live his life, but to tell his family what he wanted to do so they could know how to live their life. On June 21, 2014, Suliman sent an email to Relative One advising that he was safe and not to worry about him, and that he had left his car at an apartment complex. It is apparent that Suliman had no plan to return to the U.S. and concealed his vehicle in an apartment complex. On June 23, 2014, Suliman responded to an email from Relative One seeking to confirm that the emails were actually from him with answers and a statement concerning paradise for martyrs.

21. On October 23, 2018, Suliman and one of his relatives arrived at the U.S. Embassy in Khartoum, Sudan to pick up Suliman's renewed passport at the Consular Affairs Section of the U.S. Embassy. Suliman and his relative agreed to a consensual non-custodial interview. The interview was covertly audio recorded.

22. In substance, during that interview, Suliman stated that in or about May 2014 he conducted research on the internet on how to get to Syria. Suliman admitted that he found information on an ISIS site that provided instructions on travel through Gaziantep, Turkey to enter Syria to join ISIS. The site directed travelers to go to hotels in Gaziantep and then ask how to get into Syria. Suliman admitted that he then used his bank card and purchased a one-way Turkish Airline ticket from Orlando, Florida, to Alexandria, Egypt. Suliman stated that he purchased the airline ticket to disguise his travel from family and others. Suliman's intention was not to travel from Istanbul, Turkey to Alexandria, Egypt. Instead, his intention was to fly to Istanbul, Turkey, then fly separately to the Syrian border. Suliman said he traveled alone.

6

23. Suliman stated that between approximately June 10 and 15, 2014, he arrived in Istanbul, Turkey. He activated a GSM card so he could have internet access. Suliman stayed in the airport and purchased a one-way airline ticket from Istanbul to Gaziantep, Turkey with the intent of entering Syria. Suliman admitted he traveled with enough cash for this ticket so nobody would find out where he was or what he was doing (i.e., so he didn't have to use a credit card and create an electronic record of this purchase).

24. Suliman explained that once he arrived in Gaziantep, Turkey, he stayed one or two nights at a local hotel. Suliman asked an employee at the hotel how to get into Syria. Suliman described the man as a moderate Muslim who did not provide an answer.

25. Suliman said he then visited a cafe and made acquaintances. He asked the waiter how he could get into Syria. The waiter asked why he wanted to go. Suliman admitted that he lied to the waiter and said "to get to family members." (During the interview, Suliman advised that he does not have family members in Syria.) The waiter directed Suliman to a specific bus stop and instructed him to ask bus drivers how to get into Syria. Suliman complied and found a bus driver that told him to return at night with 50 U.S. dollars.

26. On the same night, Suliman said he returned to the bus stop with the required cash and was picked up in a mini-van. There were other unknown persons in his group of different nationalities. Suliman paid the driver 50 U.S. dollars and was told by the driver he was going to be taken across the Syrian border illegally and not through any official government check point. The driver dropped off the group on a dirt path near a road. Half way down the path, as Suliman and some other individuals attempted to enter Syria, the Turkish Army arrested them.

27. Suliman said that he was detained for 10 days, that he was fingerprinted, and that his U.S. passport was taken. He said that he was interviewed three to four times. Suliman advised he was not tortured by the Turkish authorities. He said that, eventually, Turkish officials asked where he wanted to go and that he told them that he wanted to go to Sudan to be with his

7

father. Suliman was flown from Gaziantep, Turkey to Istanbul, Turkey, then onward to Khartoum, Sudan. Since being removed from Turkey, Suliman stated that he had traveled to Egypt, Saudi Arabia, and Qatar.

28.  Suliman stated that his intent for traveling to Syria was to meet with members of ISIS, Al-Nusrah Front, Jaish al-Islam and "Jabhah Shamiyah" and he claimed that he wanted to find the truth from each of these groups so he could determine who to support.[4] Suliman said that if he had reached the above-listed groups, he would have supported them with his English speaking and writing capabilities. He said he would have given them money also because he would have attempted to convince his father to send him money. Suliman admitted that he knew at the time that he attempted to enter Syria that ISIS was a designated terrorist organization. Suliman added that he did not support the beheadings and torture that ISIS engaged in, but he was willing to assist and support them in their media section and related duties, and provide financial support.

29.  Suliman voluntarily signed a written statement documenting his actions, intent, and attempted entry into Syria to support these groups. Suliman admitted that he purchased the airline ticket from Orlando, Florida to Alexandria, Egypt with his bank debit card. He then paid cash for his airline ticket from Istanbul, Turkey to the Syrian border separately and in the form of cash to disguise his travel from his family and others. He admitted that he did not intend to travel to Alexandria but to travel to the Syrian border. Suliman stated that he has been dealing with bi-polar disorder since mid-2006. He said that when he does not take his medication correctly, he changes his thoughts and religious views to from those of a moderate Muslim to those of a Salafi Muslim. He said that when he tried to travel to Syria and

---

[4] This statement was not true as al-Jabha al-Shamiya, a Syrian rebel group, was not formed or created until late December 2014 – six months after Suliman's attempt to illegally enter Syria. Your affiant believes that Suliman created this cover story in an attempt to conceal his true intent to join ISIS in Syria. Your affiant is aware that individuals who travel to join ISIS commonly create cover stories about their travel to conceal their true intentions. Your affiant notes that there are additional indications that false statements were made during this interview, including Suliman's statements about staying in a hotel for one or two nights after his arrival in Gaziantep. Turkish records show that he was arrested late at night on the day that his flight landed in Gaziantep. Your affiant believes that, in making this false statement, Suliman was attempting to obfuscate the fact that he landed in Gaziantep and quickly moved forward with his plans to enter Syria to join ISIS

8

Somalia he was in a Salafist mindset.[5]

30. Based on my knowledge, training and experience, your Affiant is aware of numerous cases in which individuals from the United States and elsewhere attempted, or did, travel to Syria to join ISIS and that in many of these cases, the individuals had planned to, or did, transit through Istanbul on their way to Syria. Your Affiant is aware that ISIS recruiters told recruits to travel to Turkey where they would be met and guided into Syria. Your Affiant knows that Turkey shares a land border with Syria and that aspiring ISIS members frequently crossed the Turkish border to enter Syria to join ISIS. Like others, Suliman disguised his intentions to enter Syria from his family by only telling them he planned to travel to Egypt.

31. Turkey, during the relevant period described in this affidavit, was a primary pathway used by foreign fighters traveling to join ISIS forces in Syria. Suliman's actions are consistent with similar cases in which individuals desiring to join ISIS would use Turkey as a transition point to enter Syria. Suliman, like others during this period, would travel to Turkey prior to moving into Syria. In addition, your affiant is aware that, during the relevant time period described in this affidavit, men seeking to join ISIS frequently crossed from Turkey into Syria at the Kilis border crossing, after traveling to Gaziantep. Gaziantep is approximately 35 miles from the Turkey-Syria border crossing at the Turkish town of Kilis. In turn, Kilis is only a further 40 miles from the Syrian city of Aleppo, which at that time was the scene of significant ISIS activity.

32. I am familiar with other individuals who have traveled to Syria through Turkey to join ISIS. These individuals have admitted to using the same secretive techniques to conceal their travel and purpose to join ISIS, as Suliman did. They travelled through Istanbul, but did not proceed to their stated destination, and instead went to Gaziantep or another border town with Syria. There, they would contact persons to meet and be guided into Syria by illegal border crossings. These other individuals joining ISIS often would obtain information from the internet (ISIS sites) as to travel to Syria to join ISIS, and did not disclose their intentions to their family or

---

[5] A Salafi-jihadist is a term used to describe proponents of violent jihad, aimed at forcibly returning society to the model of the community established by the Prophet Muhammad and his immediate successors. In the context of this interview, when Suliman described his behavior and views of Islam as Salafist versus moderate, he was describing a Salafist-jihadist, as compared to a non-violent Salafist.

9

close associates.

33. According to Suliman, during an interview with your Affiant in October 2018, Suliman stated that in May of 2014, he had a plan. Suliman went online to an ISIS site and looked up how to get into Syria to fight. Based on the search he completed, he learned to get to Gaziantep, Turkey, and to local hotels to then find his way into Syria. Suliman traveled with enough cash so that when he landed in Istanbul, Turkey, he could pay for a one-way ticket to Gaziantep, Turkey and nobody could discover the purchase. Suliman booked an airline ticket from the United States to Egypt with a connection in Istanbul, Turkey. His plan in Istanbul, Turkey was to never travel to Egypt, but to then travel to Gazientep. Suliman paid cash for a one-way ticket to Gaziantep, Turkey from Istanbul, Turkey.

34. Once in Gaziantep, Turkey, as he had prepared and planned, Suliman made it to the Syrian border at an entry point commonly used by individuals crossing into Syria to join ISIS. On the night of his departure, he and others were driven to the Syrian border in a van by a local courier and not through the legal border crossing point.

35. According to open source information, many foreign fighters used Istanbul, Turkey as the first point of entry before ISIS facilitators arranged for travel to two key cities near the border, Sanliurfa and Gaziantep, Turkey. From those two cities, ISIS fighters then moved to Kilis, Elbeyli, Karkamis or Akcakale, Turkey, with Kilis serving as an important overland route for ISIS travel to and from Turkey to Syria. This mirrors Suliman's travel. Suliman landed in Istanbul, Turkey and purposely did not take his connecting flight to Egypt, which he had previously purchased to disguise his travel. Suliman then paid cash, so it could not be tracked, for a one-way ticket to Gaziantep, Turkey. From Gaziantep, Turkey, Suliman traveled to Kilis, Turkey where he was ultimately captured crossing into Syria illegally.

36. Since Suliman left the United States in June 2014, he has not returned. Your affiant has learned that he is currently in India.

## Conclusion

37. Wherefore, your affiant respectfully submits that there is probable cause to believe that the defendant, Mohamed Fathy Suliman, attempted to provide material support and resources to ISIS, a designated foreign terrorist organization, in violation of 18 U.S.C. 2339B.

38. It is requested that an arrest warrant be issued for the defendant, Mohamed Fathy Suliman, that he may be dealt with according to law.

_____
Special Agent R. David Collins
Federal Bureau of Investigation

Sworn to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone and email this 11th day of September, 2020 by Special Agent R. David Collins.

2020.09.11 11:35:50 -04'00'

_____
GARY R. JONES
UNITED STATES MAGISTRATE JUDGE

11