## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## GAINESVILLE DIVISION

**UNITED STATES OF AMERICA**

**v.**                                        **Case No. 1:21cr6-AW-MAL**

**MOHAMED FATHY SULIMAN**

**Defendant.**

_____/

## STATEMENT OF FACTS

The Defendant, **MOHAMED FATHY SULIMAN**, admits that if this case were to proceed to trial, the government could prove the following beyond a reasonable doubt.

On October 15, 2004, the United States Secretary of State designated al-Qa'ida in Iraq (AQI), then known as Jam'at al Tawhid wa' al-Jihad, as a Foreign Terrorist Organization (FTO) under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section 1(b) of Executive Order 13224. On May 15, 2014, the Secretary of State amended the designation of AQI to add the alias Islamic State of Iraq and the Levant (ISIL) as its primary name and added to the FTO listing the following aliases: the Islamic State of Iraq and Syria, ad-Dawla al-Islamiyya fi al-'Iraq wa-sh- Sham, Daesh, Dawla al Islamiya, and Al-Furqan Establishment for Media

1



Production. On September 21, 2015, the Secretary also added the following aliases to the FTO listing: Islamic State, ISIL, and ISIS (herein collectively ISIS). To date, ISIS remains a designated FTO.

On June 9, 2014, the defendant, Mohamed Fathy Suliman (Suliman), a United States citizen who was born in the United States, made an online reservation for a one-way flight from Orlando, Florida to Alexandria, Egypt using a New York-based travel agency. The flight was not direct and would require various flights that would take Suliman from Orlando to Chicago, then from Chicago to Istanbul, Turkey, and finally from Istanbul to Egypt. Suliman booked his travel with the intent to join the designated foreign terrorist group, ISIS. In furtherance of that intent, Suliman planned to deviate from his flight reservation upon reaching Istanbul, Turkey: rather than continuing to Egypt in accordance with his reservation. Suliman planned to travel from Istanbul to Gaziantep, Turkey, from which location he planned to travel into ISIS-controlled areas of Syria. Suliman undertook these actions with the belief that if he bought a one-way ticket to Istanbul, his travel would be scrutinized by law enforcement who might interfere with his plans to reach ISIS. Suliman described the plan to leave his flight plans in Turkey as his "sub-plan."

To avoid having his plans discovered, Suliman wrote an email on June 10, 2014, to the Department of Homeland Security's trip@dhs.gov email address and

attached his itinerary.  In the email, Suliman told DHS that he was going to visit his sick father and half-siblings in Egypt, and they he chose to book a one-way ticket to Egypt because buying the return in Egypt would be cheaper. Suliman knew when he wrote the email that he was not going to see his father in Egypt and that his true intent was to travel to Syria, and he wrote this email to prevent authorities from stopping his plans to join ISIS.

Suliman intended to offer himself as personnel to ISIS in the form of a translator for ISIS's media group. At the time he planned this travel, Suliman knew that ISIS was a designated foreign terrorist organization.  Suliman also knew from his internet research on the topic that Gaziantep was the closest town to ISIS-controlled territory and that he could find people in Gaziantep to help him cross the border into Syria to join ISIS. However, the government's evidence would not show that Suliman intended to join ISIS's military wing or participate in or advocate for the use any acts of violence on behalf of ISIS.

Prior to booking the flight, Suliman obtained financing for his travel from a relative.  Before leaving, Suliman did not tell his mother, sister, wife, or father about his plans. Suliman left his vehicle at an apartment complex and placed the keys under the driver's seat, and once he was out of the country. Suliman emailed his sister to let her know how to find the car and the keys.

3

On June 12, 2014, Suliman flew from Orlando, Florida to Chicago, Illinois via United Airlines flight 0540. That same day, in Chicago, Suliman boarded Turkish Airlines flights 0006 to Istanbul, Turkey.  Consistent with his plan, Suliman arrived in Istanbul, where he went to the Gama Tourism desk and purchased a domestic Turkish Airlines flight from Istanbul to Gaziantep using cash. Suliman disposed of his SIM card and obtained a second SIM card before leaving Istanbul, meaning his could access the internet without a cellular connection using Wi-Fi.

On June 14, 2014, Suliman flew via Turkish Airlines flight 2236 from Istanbul to Gaziantep.  Suliman stayed in Gaziantep briefly, and on the evening of June 14, 2014, he boarded a microbus with several other people knowing that the bus was going to drive the group to the area of the Turkish-Syria border that was closest to ISIS-controlled territory. At approximately 11:30 p.m., as the microbus neared the Syrian border, all the passengers disembarked, and were soon thereafter intercepted by Turkish law enforcement authorities.  Everyone in the group, including Suliman, was arrested. Suliman told Turkish authorities that he was simply going into Syria, then an active war zone, to travel and see how life was in Syria, which not true. Upon his release, Suliman asked to be sent to Sudan, although he was a United States citizen by birth. Suliman requested to go to Sudan

4

so he would not be arrested in the United States. Flight records show that Suliman did fly to Sudan upon his release.

In June 2014, when Suliman traveled to Turkey, the well-known videos of ISIS's beheadings had not yet appeared widely on global news services. Other information was available and widely publicized regarding ISIS atrocities, however, Suliman did not believe this information to be true in 2014. In fact, to recruit able-bodied young men and women from outside Syria and Iraq, ISIS engaged in an online recruitment campaign that included falsehoods and coercion, which Suliman believed. For example, ISIS's media wing had posted deceptive information and videos in which ISIS propagandists deliberately failed to disclose ISIS's program of mandatory military training, its arrest or assassination of persons who attempted to leave ISIS territory, or its mandatory enrollment and census coding of all persons entering ISIS territory, including children. When reports of ISIS violence or coercive practices surfaced in the media, ISIS attempted to discredit these reports, claimed it was trying to establish a new Muslim Caliphate under Sharia law, and falsely attempted to characterize such truthful statements as part of a West campaign against Islam. Instead, through word-of-mouth and person-to-person social media posts and messages that spread widely over the internet, ISIS claimed it was a welfare state that it would subsidize living expenses, such as food and fuel, and would pay members a stipend. At the time he traveled to

Syria in 2014, Suliman believed that the information about ISIS atrocities was false. The government's evidence would not show that Suliman posted or re-posted ISIS's propaganda depicting murders or beheadings.

Back in the United States, by June 19, 2014, Suliman's mother and sister were desperately trying to locate him and spoke to an FBI Special Agent for assistance in locating Suliman. Suliman's sister sent emails to Suliman in which she asked his whereabouts and implored him to consider the impact of his disappearance on his wife, child, and mother. Suliman received these emails while he was in Turkey and replied that he was fine and that his family should live their lives. Suliman deliberately withheld information about his whereabouts and intent from his family members so they would not report to the FBI that he had tried to join ISIS.

On October 23, 2018, Suliman went to the United States Embassy in Khartoum voluntarily. There, Suliman and his mother met with Special Agent David Collins (Collins). Suliman told Collins that he had planned to leave the Alexandria, Egypt trip in Istanbul and go the Gaziantep. Suliman told Collins that he disposed of his original cellular phone's SIM, the computer storage and processing part of his cell phone that contained stored information, linked the device to his then-cellular telephone number, and could have been used by law enforcement to attempt to locate him or acquire digital evidence. Suliman spoke

6

about what type of support he would offer ISIS, and said he would not have supported ISIS violence, but would have supplied translation services to ISIS's media, Regarding his mental state when he attempted to enter Syria, Suliman stated as follows:

> I, I was, I was kind of at the beginning of an episode…I, I, it wasn't, it wasn't my full-fledged manic episode. It was the beginning, the beginning of symptoms…Like I said all of this is [be]cause I was sick when I [unintelligible]. When I'm sick, I feel grandiose. So yeah [,] I like to go to these adventure, adventure places…

Suliman also stated that, when he was arrested in Turkey, he had his medication with him, and that, "…I told them [referring to Turkish authorities] …I showed them my medication. I took my medication with me."

At the time Collins spoke to Suliman in Khartoum, he detected no manic symptoms and Suliman presented as lucid.

Since 2014, Suliman has not traveled to join an FTO.

## ELEMENTS

### Count 1 - 18 U.S.C. § 2339B – Attempt To Provide Material Support To A Designated Foreign Terrorist Organization

(1)   The defendant knowingly provided material support or resources to an organization described in the Indictment; and

(2)   The defendant did so knowing that the organization was a designated terrorist organization or that the organization engages in or engaged in terrorist activity.

For an attempt to commit the crime of providing material support or

resources to an organization described in the Indictment:

(1)   The defendant knowingly intended to commit the above offense; and

(2)   The defendant's intent was strongly corroborated by his taking a substantial step toward committing the offense.

The term "material support or resources" means any "property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communication equipment, facilities, weapons, lethal substances, explosives, personnel (one or more individuals, who may include oneself), and transportation. Medicine or religious materials are not included."

Respectfully submitted,

JASON R. COODY
United States Attorney

FRITZ SCHELLER, ESQ.
Attorney for Defendant

4/25/2023
Date

DAVID P. BYRON
Assistant United States Attorney
Northern District of Florida
Florida Bar No. 0105777
401 SE First Ave, Suite 211
Gainesville, FL 32601
352-378-0996
David.byron@usdoj.gov

4/25/2023
Date

MOHAMED FATHY SULIMAN
Defendant

4/25/2023
Date

8