UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                                                    CASE NO.: 1:21-cr-6-AW-GRJ

MOHAMED FATHY SULIMAN,

    Defendant.

_____/

**DEFENDANT'S SENTENCING MEMORANDUM**

The Defendant, MOHAMED FATHY SULIMAN ("Mr. Suliman"), by and through his undersigned attorney, respectfully submits this Sentencing Memorandum for this Honorable Court's consideration. Mr. Suliman requests this Court impose a sentence of 36 months to be followed by a lengthy term of supervised release after reviewing the factors set forth pursuant to 18 U.S.C. § 3553(a).

**STATEMENT OF FACTS**

***Procedural History***

1. On April 25, 2023, Mr. Suliman pled guilty to an attempt to provide material support to a designated foreign terrorist organization (ISIS), in violation of 18 U.S.C. § 2339B(a)(1). Doc. 165.

2. Mr. Suliman's sentencing hearing is set for July 24, 2023. Doc. 175.

1

### *Sentencing Considerations*

3.      The Presentence Report (PSR) calculates Mr. Suliman's total offense level as a level 23 with a criminal history category of I.  *See* PSR (Doc. 769) at ¶¶ 41, 46. As a result, Mr. Suliman is facing a guideline sentencing range of 46 to 57 months of incarceration. *Id.* at ¶ 71.  There are no objections to the PSR. *See* Fed. R. Crim. P. 32(f)(requiring the parties to serve written objections to PSR's guideline within 14-days of its first disclosure).

Mr. Suliman requests a sentence of 36 months to be followed by a lengthy term of supervised release. As this memorandum demonstrates, such a sentence is sufficient, but not greater than necessary to conform with the requirements of 18 U.S.C. § 3553(a).

### **MEMORANDUM OF LAW**

 Although federal cases often implicate the tension between prosecutorial prerogative and judicial discretion at sentencing, the Supreme Court recently affirmed the superior role that federal courts play in achieving justice. *See Concepcion v. United States*, 142 S.Ct. 2389 (June 27, 2022). In *Concepcion,* the United States Supreme Court reaffirmed three principles of federal sentencing.

First, the Court concluded that "[t]here is a longstanding tradition in American law, dating back to the dawn of the Republic, that a judge at sentencing considers the whole person before him or her "as an individual.'" *Concepcion*, 142 S.Ct. at 2395 (citing *Koon v. United States*, 518 U.S. 81, 113 (1996)). Thus, a court

is unencumbered in its ability "to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall v. United States*, 552 U.S. 38, 53 (2007) (quotation omitted).

Pursuant to this commandment of individualized sentencing, the Supreme Court's second principle encourages a district court judge to exercise "wide discretion in the sources and types of evidence used" to craft appropriate sentences. *Concepcion*, 142 S.Ct. at 2395-6 (citation omitted). *See also Pepper v. United States*, 562 U.S. 476, 488 (2011)("Permitting sentencing courts to consider the widest possible breadth of information about a defendant ensures that the punishment will suit not merely the offense but the individual defendant").

Finally, the third principle requires a sentencing court to consider the defendant as he appears before it on the day of his sentencing, "not on the date of his offense or the date of his conviction." *Id.* (citing *Pepper*, 562 U.S. at 492).

Consistent with these three principles, § 3553(a) requires sentencing courts to consider not only the advisory Guidelines range, but also the facts of a specific case through the lens of seven factors as discussed below. *See* 18 U.S.C. § 3553(a)(1)-(7). The factors set forth under § 3553 recognize that a court should consider a broad range of information in determining a defendant's sentence. Perhaps the most explicit recognition of this principle is found in the statutory requirement that "[n]o limitation shall be placed on the information concerning

3

the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." *See* 18 U.S.C. § 3577.

These authorities contemplate the tenet that justice lies not in the limited tales the parties tell, but rather in the expansive narratives a court needs to hear. It is only through the latter mechanism that a court achieves an accurate and complete perspective in measuring a Defendant's life.  Against the backdrop of the seven statutory factors, Mr. Suliman's requested prison sentence of 36-months to be followed by a lengthy term of supervised release is sufficient but not greater than necessary to satisfy the purposes of § 3553(a). *See Pepper*, 562 U.S. at 476 (a "sentencing judge's overarching duty under § 3553(a) [is to] to impose a sentence sufficient, but not greater than necessary").

**1.    The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant**

By linking a defendant's criminal conduct with his personal history and characteristics, the first § 3553(a) factor comprehends that a defendant's criminal conduct should not be considered in isolation or even as the paramount sentencing factor. *See, e.g., United States v. Adelson*, 441 F. Supp. 2d 506 (S.D.N.Y. 2006)(Rakoff, J.)("But, surely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance").  In this way, the first factor recognizes that every case contains a

narrative of the "human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."

If Mr. Suliman's sentence was to be based solely on the facts of his criminal conduct, then a guideline sentence would be appropriate. But of course, § 3553(a) is not founded on a single consideration.[1]  And the reason for that can be seen in Mr. Suliman's case. To be sure, moving from a sole focus on Mr. Suliman's crime to a broader consideration of his history and characteristics, as well as the other § 3553(a) factors, provides a more accurate and just examination. Although Mr. Suliman's conduct was serious, his case involves significant mitigating factors concerning his history and characteristics, as well as mitigating aspects regarding the offense itself and in the issues that compelled him to commit his crimes.

As a result, a deliberation which weighs the good with the bad reveals that Mr. Suliman's criminal conduct cannot be the only consideration. Rather, Mr. Suliman's personal history and characteristics demonstrate an individual worthy of this Court's mercy. Indeed, Mr. Suliman's life has been marked by his dedication to his family and his great compassion for others. *See generally Letters of Support*, attached hereto as composite Exhibit 1.

---

[1] A defendant's offense conduct is essentially the predominant, if not only, consideration for guidelines' imprisonment ranges.  While highly relevant of course, focusing mainly on the Defendant's crimes results in a biased and limited narrative under 18 U.S.C. § 3553. Such biased and limited narratives have a profound and negative impact on decision-making. *See*, *e.g.*, Akira Kurosawa, *Rashomon* (Daiei Films release on Dec. 26, 1951, in the U.S.).

*Dedication to Family*

Concerning his dedication to his family, the Defendant's sister writes:

> My father was seldom around due to working overseas. But when I reflect on why that didn't negatively affect me too much, it's because Mohamed was always there, filling my Dad's shoes, and more. From as young of an age as I can remember, Mohamed was paying the bills, making our doctor's appointments, picking up the groceries, and being not only my mom's eldest son, but her reliable eldest son who eased all the difficulties of being an immigrant, practically single-mother, in America.

Ex. 1, *Letter of Iman Suliman.  See also id.*, Letter of Amro Suliman ("His priorities revolve around his family, mainly his daughter whom he loves dearly and takes great care of in raising").  Concerning the Defendant, Iman Suliman further writes:

> Mohamed was the brother I would be excited sharing my day with after school. Mohamed was my brother who would with so much enthusiasm tell me a story of a prophet when I was a kid, like the story of Prophets Moses and Joseph, and through this, he built my love for my faith. Mohamed was my brother who would mediate between our parents so that me and my middle brother were shielded from that. Mohamed was my brother who always taught me to give the best of myself to my family and my parents and to always return a bad act with a good act. Mohamed was my brother who I was so sad to see go off to college, because I knew how much of a loss I'd experience without him. Mohamed was my brother who when he was diagnosed with bipolar disorder at the end of his freshman year in college (the first time he was without his family), my world came crushing down as I tried to make sense of what his mental health illness meant and how it would affect him.

*Id.*, *Letter of Iman Suliman.*

*Compassion*

Iman Suliman's letter beautifully captures the soul of her brother – a soul which embodies kindness and compassion. Such a depiction reveals an important

6

theme in the Letters of Support. In addition to his dedication to his family, the letters also portray Mr. Suliman as a gentle and peaceful individual characterized by his great compassion for others. See Ex. 1,. *Letter of Aicha Chahbaouy* ("He was always a soft-spoken man; never raised his voice in anger nor has he ever been involved with anything aggressive"); *Letter of Ali Amir* ("Mohamed was a very peaceful kid throughout his childhood, and as well after he grew up as I interacted with him on many occasions").

> Concerning his great sense of compassion, Angie Suliman states:
>
> Mohamed is one of the most selfless individuals I know. He spends everything he has on the less fortunate, and always encourages others to donate and give charity whether it's to other family members or strangers.

*See* Ex. 1, *Letter of Angie Suliman*. Similarly, Abdelmonim Bakhit describes Mr. Suliman has "a sweet boy who is respectful, honest, and genuine. He is the type to put others before himself and lend a hand even if he isn't able to." *See id.*, *Letter of Abdelmonim Bakhit*. Likewise, Mussah Khair asserts "[s]ince we grew up together, Mohamed is known for his love of goodness for people. He gave his life to do good and serve people. He is a generous person without limits." *Id.*, *Letter of Mussah Khairi; see also id., Letter of Dr. Hana Khairi (*stating that Mr. Suliman is known for his kindness and generosity to those in need).

Mr. Suliman's great sense of compassion is further demonstrated by his contributions to his extended family and community. As Amro Suliman asserts, "I have only known [Mr. Suliman] to be one of the most generous people, helping his

mother with her non-profit organization that provides for single mothers, their children and orphans." Ex. 1. *Letter of Amro Suliman*. *See also id.*, *Letter of Fathy Suliman* (stating that from a young age, his son was "always a loving and caring gentleman" who "always loved helping people of all ages and helping his community"). In the end, the letters portray Mr. Suliman as providing support to others in countless ways and through lovely actions.[2] *See id.*, *Letter of Khaled Abdelghany*, *Letter of Raheel Suliman*, *Letter of Shireen Sadar*.

Because Mr. Suliman has such exemplary qualities, the fact that he is now a convicted felon seems incomprehensible. Indeed, Mr. Suliman has been a peaceful and caring person marked by his great love for others. But answering the question of how Mr. Suliman became a convicted felon is critical since it is the point in which the interplay between his criminal acts and his history and characteristics becomes particularly relevant. Such an interplay reveals significant mitigating factors concerning the Defendant's culpability.

An assessment of a defendant's culpability requires an analysis of "his intent (mens rea), motives, role in the offense, and mental illness or diminished capacity." Richard S. Frase, *Excessive Prison Sentences, Punishment Goals, and the Eighth Amendment: "Proportionality" Relative to What?*, 89 Minn. L. Rev. 571, 590 (Feb.

---

[2] As the poet and abolitionist James Russell Lowell stated, "[e]very man feels instinctively that all the beautiful sentiments in the world weigh less than a single lovely action." James Russell Lowell, *Among My Books*, 358 (1898)

2005). Applying this framework to Mr. Suliman's case, the factors of mental illness and motive are especially relevant. The following discusses these factors in turn.

*Mental Illness*

Mr. Suliman's culpability in the instant case is mitigated by his struggles with mental illness. While Mr. Suliman's offense was serious, it did not occur in a vacuum. Rather, Mr. Suliman's actions were the result of a long history of mental illness – the unsurprising product of a severely impaired mind.

Significantly, Suliman's struggles with mental illness began approximately 17 years ago. *See* PSR at ¶ 59 (noting that the Defendant's mental health problems began or escalated in 2006). From that point, Mr. Suliman was hospitalized on at least 15 occasions for psychiatric treatment, often involuntarily, in both the United States and overseas. *See* PSR at ¶¶ 59-62; *Report of Dr. Jeffrey Danziger* ("Danziger Report"), included with the PSR, at ¶ 37. This lengthy history of treatment and hospitalizations establishes that Mr. Suliman suffers from significant mental illness. Throughout his 17-year battle with mental illness, psychiatrists and experts, including Dr. Feldman with the Department of Justice and Dr. Jeffrey Danziger, [3] have come to this unfortunate, but unavoidable conclusion.

In conducting his evaluation of Mr. Suliman, Dr. Danziger considered

---

[3] Dr. Jeffrey Danziger, a well-respected psychiatrist, has testified as an expert in both federal and state courts for both the prosecution and the defense.

numerous sources, including: 1) a forensic interview with the Defendant; 2) a review of the Defendant's extensive medical and psychiatric records; and 3) a review of other records including jail records and relevant court documents. Based on such a review and examination, Dr. Danziger agreed with the Defendant's other providers, including Dr. Feldman, that Mr. Suliman suffers from bipolar disorder type 1.[4] *Danziger Report* at ¶ 54. Mr. Suliman's bipolar disorder manifests itself in "a history of major depressive episodes, but the manic episodes, which tend to be accompanied by paranoid and religious delusions, along with agitation and disorganization, have been more problematic and have resulted in numerous inpatient hospitalizations." *Id.* Mr. Danziger further notes that Mr. Suliman's "actions and behavior as it relates to the alleged offense [were] substantially impacted by severe mental illness." *Danziger Report* at ¶ 59. Dr. Danziger states:

> [i]t is my opinion at the time of the alleged offense, the defendant was laboring under a severe mental disease, bipolar disorder type one, mania, with psychotic features. It is further my opinion the manifestations of his severe mental illness significantly impacted the defendant's ability to understand the wrongfulness of the behavior compromising the offense, and substantially impacted his ability to exercise the power of reason. It is my opinion the significantly reduced mental capacity was not caused by the voluntary use of drug or other intoxicants.

*Id.*

Dr. Danziger's conclusion that Suliman's criminal actions were impacted by

---

[4] According to the DSM-V, Bipolar Disorder Type 1 is characterized by one or more manic episodes. *See* American Psychiatric Society, *DSM-V,* at 126 (2013).

his bipolar disorder are consistent with the manifestations of that mental illness. The Diagnostic and Statistical Manual of Mental Disorders ("DSM-V") notes that Bipolar Disorder Type I is "sufficiently severe to cause marked impairment in social or occupational functioning or to necessitate hospitalization to prevent harm to self or others, or there are psychotic features. *See* American Psychiatric Society, *DSM-V,* at 124 (2013).

Mr. Suliman's mental illness explains why an individual, with no criminal history, can engage in a criminal act, without insight into its seriousness or its significant risk of danger. Such mental illness also demonstrates Mr. Suliman's lesser culpability. In the end, Mr. Suliman sinned in committing his crime, but he sinned because of the mental illness he suffered. Robert Louis Stevenson, *The Strange Case of Dr. Jekyll and Mr. Hyde,* (Longman, Green & Co 1886)("If I am the chief of sinners, I am the chief of sufferers also").

*Motive*

Mr. Suliman's motive in committing his offense was not predicated on his desire to join ISIS to further its violent actions. Indeed, "the government's evidence [does] not show that Suliman intended to join ISIS's military wing or participate in or advocate for the use any acts of violence on behalf of ISIS." Statement of Facts to Plea Agreement, Doc 169 at p. 3.  Instead, Mr. Suliman believed that allegations concerning atrocities committed by ISIS were false. *See* PSR at ¶ 26. Rather, his motive in traveling to Syria was based on his desire to live in an idyllic Muslim

world and he could act as translator for ISIS's media wing. Doc. 169 at p. 3. But this was an ISIS con and Mr. Suliman's mental illness made him particularly susceptible to this con. Both the stipulated facts and the PSR capture the shell game that ISIS played on Mr. Suliman and others:

> to recruit able-bodied young men and women from outside Syria and Iraq, ISIS engaged in an online recruitment campaign that included falsehoods and coercion, which Suliman believed. For example, ISIS's media wing had posted deceptive information and videos in which ISIS propagandists deliberately failed to disclose ISIS's program of mandatory military training, its arrest or assassination of persons who attempted to leave ISIS territory, or its mandatory enrollment and census coding of all persons entering ISIS territory, including children. When reports of ISIS violence or coercive practices surfaced in the media, ISIS attempted to discredit these reports, claimed it was trying to establish a new Muslim Caliphate under Sharia law, and falsely attempted to characterize such truthful statements as part of a West campaign against Islam. Instead, through word-of-mouth and person-to-person social media posts and messages that spread widely over the internet, ISIS claimed it was a welfare state that it would subsidize living expenses, such as food and fuel, and would pay members a stipend.

Doc 169 at p. 5; *see also* PSR at ¶ 21.

The Defendant's father, Fathy Suliman, accurately portrays the Defendant's naïve motive, and thus his lesser culpability, in committing his crime:

> [m]y son believed in an ideal Muslim life of peace, harmony, and compassion. He has always lived those principles in his own life. He is a kind and gentle person. But he is also very naïve. I can imagine he believed the lies and propaganda of groups who promised their followers this peaceful life. It was a lie.

Ex. 1, Letter of Fathy Suliman.

**2.    The Need for the Sentence Imposed**

    *A.    To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense*

In imposing a just sentence, this Court should consider the significant punishment resulting from the collateral consequences of Mr. Suliman's felony conviction. Prior to the instant offense, Suliman had no felony record. Based on his felony conviction, Suliman now faces an overwhelming number of collateral consequences. A congressional report authored by the United States Government Accountability Office (GAO) demonstrates that there are 641 collateral consequences of a nonviolent felony conviction. *See* GAO Report 17-691, NONVIOLENT DRUG CONVICTIONS, *Stakeholders Views on Potential, Actions to Address Collateral Consequences*, (Sept. 2017), summary excerpt attached hereto as Exhibit 2. Of these 641 collateral consequences, 497 (78%) of them may last a lifetime. *See id.* To be sure, "[t]he United States has a uniquely extensive and debilitating web of collateral consequences that continue to punish and stigmatize individuals with criminal records long after the completion of their sentences." U.S. Comm'n on Civil Rights, *Collateral Consequences, The Crossroads of Punishment, Redemption, and the Effects on Communities,* Executive Summary (June, 2019)("[I]ndividuals with criminal histories can face barriers to voting, serving on a jury, holding public office, securing employment, obtaining housing, receiving public assistance, owning a firearm,  getting a driver's license, qualifying for financial aid and college admission, qualifying for military service, and deportation

(for noncitizens)"), attached hereto as Exhibit 3.

Recognizing the effect of collateral consequences of a felony conviction, courts have emphasized that federal judges should account for such an impact at sentencing. *United States v. Nesbeth*, Case No. 1:15-cr-00018, 2016 WL 3022073, at *1 (E.D.N.Y May 24, 2016)(Block, J.)(varying downward from guideline range of 33 to 44 months imprisonment to one-year of probation based in part on the number of statutory and regulatory consequences resulting from a felony conviction). *Nesbeth* establishes that the civil death that Suliman now faces due to his conviction constitutes significant punishment. *See also United States v. Stewart*, 590 F.3d 93, 141-142 (2d Cir. 2009)("It is difficult to see how a court can properly calibrate a 'just punishment' if it does not consider the collateral effects of a particular sentence"). Wayne A. Logan, *Informal Collateral Consequences,* 88 Washington Law Review 1103 (2013)("Today, convict status serves as a perpetual badge of infamy, even serving to impugn reputation beyond the grave").

Finally, Mr. Suliman's request for a lengthy period of supervised release increases the harshness of his punishment. *See Gall,* 552 U.S. at 38 (a sentence of probation is "a substantial restriction of freedom."); *Jones v. Cunningham,* 371 U.S. 236, 242 (1963)("[T]he custody and control of the Parole Board involves significant restraints on petitioner's liberty because of his conviction and sentence, which are in addition to those imposed by the State upon the public generally... what matters is that they significantly restrain petitioner's liberty to do those

things which in this country free men are entitled to do.").

### B.      To afford adequate deterrence to criminal conduct

The preceding established that a lengthy prison sentence is not necessary to accomplish just sentencing. In turn, this section addresses the question of whether a long prison sentence will accomplish the § 3553 factor of deterrence. Such an analysis requires an analysis of both general and specific deterrence.

### 1. General Deterrence

The principle of general deterrence is based on the premise that lengthy prison sentences deter crime. Not surprisingly then, federal prosecutors consistently argue the factor of general deterrence in support of guideline sentences. And why wouldn't they? If you consistently assert that prison sentences are not only necessary to punish the Defendant but also are needed to prevent crimes, then you gain strong support for guideline sentences that mandate imprisonment. The troubling aspect of the premise that incarceration deters crime is that it is utterly wrong and has led to mass incarceration. *See* Dr. Oliver Roeder et al., *What Caused the Crime Decline*?, Brennan Center for Just., 22-23 (Feb. 12, 2015). The condition of mass incarceration is especially disturbing since there is no correlation between punishment and reductions in crime. *See id; see also* Gary Kleck and J.C. Barnes, *Deterrence and Macro-Level Perceptions of Punishment Risks:  Is There a "Collective Wisdom"*?, 59 Crime & Delinquency 1006, 1031-33 (2013)(concluding that "increases in punishment levels do not routinely reduce

crime through general deterrence mechanisms, because the fundamental link between punishment levels and perceptions of punishment levels appears to be weak to nonexistent").

A federal prosecutor's reliance on the § 3553(a) factor of general deterrence is also troubling since such a posture contradicts his or her employer's position on the matter. The Department of Justice (DOJ) agrees with the conclusion that incarcerating defendants is not an effective means of deterrence. *See* U.S. Dept. of Justice, Nat'l Inst. of Justice, *Five Things About Deterrence* (July 2014), attached hereto as Exhibit 4. In fact, the DOJ finds that even increasing the severity of punishment does little to deter punishment. *See id.*; *see also* Hannah Arendt, *Eichmann in Jerusalem*, Epilogue (1963)("No punishment has ever possessed enough power of deterrence to prevent the commission of crimes"). Rather, arrests and prosecutions deter crime. *See id.*

2. *Specific Deterrence*

Having established that prison sentences, regardless of length, have no impact on general deterrence, this section demonstrates that the factor of specific deterrence also supports Suliman's request for a variance.

a. *The relationship between incarceration and recidivism*

As in the case of general deterrence, the empirical evidence does not establish a relationship between sentence length and specific deterrence, regardless of the type of crime. *See* National Institute of Corrections*, Myths and*

16

*Facts, Why Incarceration is Not the Best Way to Keep Communities Safe* (2016), attached hereto as Exhibit 5. To be sure, the best available evidence establishes that imprisonment does not reduce recidivism more than noncustodial sanctions. Francis T. Cullen et al., *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011). There is strong evidence that prison actually contributes to increased recidivism. *See Criminogenic Effects of Imprisonment: Evidence from State Panel Data 1974-2002,* 6 Criminology & Public Policy 589 (2007).

Thus, the most effective to promote public safety and ensure that convicted persons can lead law-abiding lives is through broad use of non-incarceration sentences, especially since "incarceration does little to change a person's behavior" and persons sentenced to prison have higher recidivism rates than those sentenced to community corrections.  Ex. 5 at 1, 4. *see also* Friedrich Nietzsche, *The Genealogy of Morals*, essay 2, aph. 14 (1887).("All in all, punishment hardens and renders people more insensible; it concentrates; it increases the feeling of estrangement; it strengthens the power of resistance").

b.      *Mr. Suliman's low risk of recidivism*

Against this backdrop, the likelihood that the defendant "will engage in future criminal conduct [is] a central factor that district courts must assess when imposing sentence." *Pepper,* 562 U.S. at 492.  As the PSR notes, Mr. Suliman has no criminal history points and thus is in Criminal History Category 1. *See* PSR at ¶

46. In fact, Mr. Suliman has never been arrested.  The Sentencing Commission has concluded that empirical evidence shows that "first offenders" generally pose the lowest risk of recidivism. *See*, *e.g.*, U.S. Sent. Comm'n, "Recidivism Among Federal Offenders: A Comprehensive Overview," at 18 (2016), *available at* http://www.ussc.gov/research/research-publications/recidivism-among-federal-offenders-comprehensive-overview.

In addition to his lack of criminal history, Mr. Suliman has nearly completed his college education and does not use alcohol or other narcotics.  Because of his education, as well as his lack of a criminal history and substance abuse, Mr. Suliman poses a lower risk of recidivism. *See* U.S. Sent. Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* at 12-13 (May 2004). Finally, a long period of supervision, with compulsory psychiatric treatment and restrictions on travel,[5] will further satisfy the § 3553 concern with specific deterrence.

> C.      *To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment*

Based on his mental health history, Suliman requires extended mental health treatment. Such treatment would be better accomplished under the supervision of the United States Probation Office rather than the Bureau of Prisons

---

[5] In addition to court-imposed travel restrictions including the surrender of Mr. Suliman's passport, it seems apparent that the United States Government has placed Mr. Suliman on its no-fly list, which further restricts his ability to travel internationally.

(BOP). Indeed, the BOP has a poor history of treating the mentally ill. *See* Thompson and Eldridge, *Treatment Denied: The Mental Health Crisis in Federal Prisons*, The Marshall Project (Nov. 21 2018), available at https://www.themarshallproject.org/2018/11/21/treatment-denied-the-mental-health-crisis-in-federal-prisons. *See also* Office of Inspector Gen., U.S. Dep't of Justice, *Review of the Federal Bureau of Prisons' Use of Restrictive Housing for Inmates with Mental Illness,* (July 2017). In contrast a long period of supervision will allow U.S. Probation to monitor Mr. Suliman's adherence to a regimen which includes treatment and medications, which is consistent with the recommendations of Dr. Danziger. To be sure, Dr. Danziger finds that:

> The defendant has responded well to treatment with mood stabilizing medications, and with the treatment the defendant is receiving at the jail, the defendant presents with a normal and unremarkable mental status examination. He is currently free of depressive, manic, and psychotic symptoms, and he demonstrated good insight into his condition, acknowledging the psychiatric disorder, and the need for treatment to prevent any future relapses. It is my opinion the defendant is suffering from a mental illness unrelated to substance use, which requires specialized treatment, and for which the defendant is amenable to treatment.

Danziger Report at ¶ 60.

### 3. The Kinds of Sentences Available

Because a minimum mandatory penalty does not apply, Mr. Suliman's requested sentence is permitted.

19

## 4-5.  The Guideline Sentencing Range Established and Any Policy Statements

There are two specific Guideline provisions or Amendments that support Mr. Suliman's request for a 36-month sentence. First, recognizing that a defendant's culpability is mitigated by his mental illness, the federal sentencing guidelines authorize departures based on a defendant's diminished capacity. *See* USSG § 5K2.13. Section 5K2.13 states, in pertinent part, that

> A downward departure may be warranted if (1) the defendant committed the offense while suffering from a significantly reduced mental capacity; and (2) the significantly reduced mental capacity contributed substantially to the commission of the offense. Similarly, if a departure is warranted under this policy statement, the extent of the departure should reflect the extent to which the reduced mental capacity contributed to the commission of the offense.

USSG § 5K2.13.

As discussed in Section 1, supra, Mr. Suliman has suffered from standing Bipolar disorder I for some 17 years. Notably, he suffered from mental illness at the time he committed the instant offense. Again, Dr. Danziger concluded that the defendant was suffering from a severe mental disease at the time he committed his offense which impacted the defendant's ability to understand the wrongfulness of the behavior. *Danziger Report* at ¶ 59.

Moreover, the future promulgation of USSG § 4C1.1 provides a second ground supporting Mr. Suliman's requested sentence. On May 3, 2023, the United States Sentencing Commission published notice of submission to Congress of amendments to the sentencing guidelines effective November 1, 2023. *See*

Sentencing Guidelines for the United States Courts, 88 Fed. Reg. 28254, 28271 (May 3, 2023). Absent action from Congress to the contrary, the submitted amendments become effective by operation of law on November 1, 2023. *Id.* at 28524. This is a near certain outcome. Indeed, the Sentencing Commission has amended the Guidelines Manual more than 800 times over a period of four decades. During the past forty years, Congress has rejected a proposed amendment only once. *See* Cong. Research Serv., Congressional Review of Proposed Amendments to the U.S. Sentencing Guidelines (June 6, 2023), attached hereto as Exhibit 6.

As relevant here, the guidelines will be amended to include an "Adjustment for Certain Zero-Point Offenders"—that provides a 2-level downward adjustment to the offense level for defendants, like Mr. Suliman with no criminal history whose offenses fit within the guideline's criteria. *See id.* (to be codified at USSG §4C1.1); *see also* "Reader Friendly" Version of 2023 Adopted Amendments, *available at* https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202305_RF.pdf . As the commentary notes:

> [t]his amendment is the result of several Commission studies regarding the nature of the criminal history of federal offenders, including analyses of the number and types of prior convictions included as criminal history and the ability of the criminal history rules to predict an offender's likelihood of rearrest. While these studies continue to recognize the close association between an offender's criminal history calculation under the guidelines and the likelihood of future recidivism, the amendment makes targeted changes . . . to reduce recommended guideline ranges for offenders with zero criminal history points under the guidelines ("zero-point

offenders") . . . . These targeted amendments balance the Commission's mission of implementing data-driven sentencing policies with its duty to craft penalties that reflect the statutory purposes of sentencing.

Sentencing Guidelines for United States Courts, 88 Fed. Reg. 28254, 28271-28272.

This new Guideline would provide for a 2-level decrease in the total guideline offense level for defendants, such as Mr. Suliman, who have zero criminal history points. *See* 88 Fed. Reg. 28254, 28271 (May 3, 2023) (to be codified at USSG § 4C1.1). Because this new guideline will not go into effect until November 1, 2023, a variance of 2-levels is warranted. *See*, *e.g.*, *United States v. Myers*, 854 F.3d 341, 358 (6th Cir. 2017) ("precedents allow consideration of a pending Guidelines amendment") (internal quotation and citation omitted); *see also United States v. Hayden*, 775 F.3d 847, 850 (7th Cir. 2014) ("Although a sentencing judge may grant a variance from the guidelines range as a way of recognizing the likely effect of a pending amendment to the guidelines, the judge is not required to do so."); *United States v. Allebach*, 526 F.3d 385, 389 (8th Cir. 2008) (same).

Assuming that USSG § 4C1.1 takes effect on November 1, 2023, which is approximately three months after Mr. Suliman's current sentencing date, his guideline offense level becomes a 21. Because he has no criminal history, Mr. Suliman would be facing 36 to 47 months of imprisonment. *See* Sentencing Table, USSG Ch. 5, Pt. A.

**6.    The Need to Avoid Unwarranted Sentence Disparities among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct.**

The undersigned will address this factor at the time of sentencing.

**7.    The Need to Provide Restitution to Any Victims of the Offense.**

Restitution is not applicable in the instant case. *See* PSR at ¶¶ 83-84,

**CONCLUSION**

An advisory guideline sentence is not only antagonistic to § 3553(a), but also violates *Koon's* holding that a court must consider the individual defendant and the unique circumstances that mitigate the crime and punishment to ensue.

/s/ Fritz Scheller
Fritz Scheller
Florida Bar Number 183113

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel in this case on July 20, 2023.

/s/ Fritz Scheller
Fritz Scheller
Florida Bar Number 183113
200 East Robinson, Suite 1150
Orlando, Florida 32801
Telephone 407-792-1285
Facsimile 407-649-1657
Email: fscheller@flusalaw.com

23