# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF FLORIDA GAINESVILLE DIVISION

**UNITED STATES OF AMERICA**

v.     Case No. 1:21cr6-AW-GRJ

**MOHAMED FATHY SULIMAN**
_____/

## GOVERNMENT'S MEMORANDUM ON THE APPLICATION OF THE TERRORISM ENHANCEMENT

Pursuant to 18 U.S.C. § 3553(a), the United States, by and through the undersigned Assistant United States Attorney, hereby files this Sentencing Memorandum on the application of United States Sentencing Guidelines ("the Guidelines"), Section 3A1.4 ("the enhancement") to the conduct of Defendant Mohamed Fathy Suliman.

## LEGAL ARGUMENT

Although the Sentencing Guidelines are now advisory, a district court must properly calculate the applicable Guidelines range and consider it as a factor in sentencing. United States v. Crawford, 407 F.3d 1174, 1178-79 (11th Cir. 2005). To properly calculate the sentencing range under the Guidelines, the court must also consider any available departures, including upward departures that may

apply.  United States v. Jordi, 418 F.3d 1212, 1215 (11th Cir. 2005). The Government bears the burden of proving the application of the terrorism enhancement, U.S.S.C. § 4A1.4(a), by a standard of preponderance of the evidence.  United States v. Arcila-Ramirez, 16 F.3d 1085, 1114 (11th Cir. 2021).

The Guidelines provide for several victim-related enhancements designed to allow federal courts to increase penalties for crimes that include terrible impacts on human beings. The terrorism enhancement, a victim-related enhancement, applies to Defendant's conduct because his offense was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct," under 18 U.S.C. § 2332(b)(5)(A); U.S.S.G. § 3A1.4(a).

The specific language of the Guidelines provide as follows:

§3A1.4.    Terrorism

3A1.4(a)(a)  If the offense is a felony that involved, or was intended to promote, a federal crime of terrorism, increase by 12 levels; but if the resulting offense level is less than level 32, increase to level 32.

3A1.4(b)(b) In each such case, the defendant's criminal history category from Chapter Four (Criminal History and Criminal Livelihood) shall be Category VI.

Application Notes:

3A1.4 Application Note (1)1.  "Federal Crime of Terrorism" Defined.—*For purposes of this guideline, "federal crime of terrorism" has the meaning given that term in 18 U.S.C. § 2332b(g)(5)*.

3A1.4 Application Note (3)3.    Computation of Criminal History Category.— Under subsection (b), if the defendant's criminal history category as determined under Chapter Four (Criminal History and Criminal Livelihood) is less than Category VI, it shall be increased to Category VI.

3A1.4 Application Note (4)4.    Upward Departure Provision.—By the terms of the directive to the Commission in section 730 of the Antiterrorism and Effective Death Penalty Act of 1996, the adjustment provided by this guideline applies only to federal crimes of terrorism.  However, there may be cases in which (A) the offense was calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct but the offense involved, or was intended to promote, an offense other than one of the offenses specifically enumerated in 18 U.S.C. § 2332b(g)(5)(B); or (B) *the offense involved, or was intended to promote, one of the offenses specifically enumerated in 18 U.S.C. § 2332b(g)(5)(B), but the terrorist motive was to intimidate or coerce a civilian population, rather than to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct.*  In such cases an upward departure would be warranted, except that the sentence resulting from such a departure may not exceed the top of the guideline range that would have resulted if the adjustment under this guideline had been applied.

U.S.S.G. §3A1.4.

Under 18 U.S.C. § 2332b(g)(5), an offense qualifies as a "federal crime of terrorism" if it is listed in Section 2332b(g)(5)(B) and was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." The statute that defendant was convicted of violating—attempting to provide material support to a foreign terrorist organization, in violation of 18 U.S.C. § 2339B—is listed in Section 2332b(g)(5)(B). And defendant's crime was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct."

The relevant issue is what the defendant's criminal activity was calculated to accomplish - not his claimed motivation for his crimes. See, United States v. Mandhi, 375 F.3d 1243, 1248 (11th Cir. 2004) ("[I]t is the defendant's purpose that is relevant, and if that purpose was intended to promote a terrorism crime, the enhancement is triggered."); United States v, Awan, 607 F.3d 306, 316-17 (2d Cir. 2010) (finding the government only had to demonstrate that

defendant's offenses were intended to promote a federal crime of terrorism, whatever his reasons for committing them).

In <u>United States v. Arcila-Ramirez</u>, the 11th Circuit held:

> The word "calculated" in § 2332b(g)(5)(A) means that there is 'an intent requirement' which must be met for the terrorism enhancement to apply.[ ] To meet that requirement, 'the government must show that the defendant's offense was planned to influence, affect, or retaliate against government conduct, even if that was not the defendant's personal motive.' [ ] The enhancement applies if the government makes that showing by a preponderance of the evidence, [ ]and 'because a defendant often will not admit his full knowledge or intentions, the district court may find the requisite calculation or intent existed based on circumstantial evidence and reasonable inferences drawn from the facts[.]'

<u>United States v. Arcila Ramirez</u>, No. 22-11190, 2023 WL 3477811, at *1 (11th Cir. May 16, 2023) (not reported but applying enhancement following remand in <u>United States v. Arcila-Ramirez</u>, <u>supra</u>, 14 F.4d 1114, and referencing the same). If the defendant intended by his actions to affect or retaliate against the conduct of a government, the enhancement applies. <u>United States v. Jayyousi</u>, 657 F.3d 1085, 1114-15 (11th Cir. 2011).

The language of the Guidelines focuses on the intended outcome of the defendant's unlawful acts—i.e., what the activity was

calculated to accomplish, not what the defendant's claimed motivation behind it was. See United States v. Mandhai, 375 F.3d 1243, 1248 (11th Cir.2004) ( "[I]t is the defendant's purpose that is relevant, and if that purpose is to promote a terrorism crime, the enhancement is triggered."); United States v. Awan, 607 F.3d 306, 316–17 (2d Cir. 2010) (finding that government only had to demonstrate that defendant's offenses were intended to promote a federal crime of terrorism, whatever his reasons for committing them). This element is easily met under the facts of this case.

Defendant attempted to provide support to ISIS that would have assisted ISIS's efforts to displace "infidel" governments, as ISIS's leaders referred to most Middle Eastern leaders. Separately, Defendant's actions would have helped ISIS's years' long effort to subjugate the civilian population of Syria, with a view to toppling its governments, local and national. Finally, Defendant's actions were calculated to promote a federal crime of terrorism by assisting ISIS's campaign to recruit other fighters, who would each be providing themselves to ISIS. Aiding and abetting, and conspiring to provide

personnel (including oneself) to a designated foreign terrorist group violates 18 U.S.C. §2339B.

Defendant's crime was clearly "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct," and thus the U.S.S.G. § 3A1.4 enhancement applies. But even if this Court were to find that it was calculated only to intimidate a civilian population, an upward departure would still be warranted pursuant to note 4 of U.S.S.G. § 3A1.4.

### Defendant's Support of ISIS's Version of Sharia Meant Intimidating Civilians and Toppling the Government.

In his lengthy statement to the FBI, Defendant said, in substance, that he sought to live under Sharia Law in a Caliphate. In at least one communication with his family, close in time to his departure for Syria, he referenced Jana, or a holy place where one goes after this life, according to Muslim prophecy. While this statement might be reconcilable with an interpretation of Defendant's actions as seeking to die on the battlefield, or enter heaven after life, this language is more likely to have reflected his desire to live in a Caliphate, something he had tried to do twice previously when he

entered Somalia under Sheikh Sharif. Defendant's desire to enter this imagined Caliphate was in alignment with ISIS's public statements about the establishment of the Caliphate just one year before Defendant attempted to join ISIS. To establish its Caliphate with its version of Sharia law, ISIS engaged in battles wherein it sought to topple governments and intimidate a civilian population.

### The Timing of Defendant's Crime Coincided with ISIS's Seizure of Swaths of Syria By Force and Followed Closely After ISIS's Designation as an FTO

Defendant sought to enter an active war zone where ISIS was committing acts of terrorism and violations of international norms prohibiting war crimes. In 2014, ISIS was involved in the taking of the homes of civilians and enslavement of individuals from minorities. These actions are irreconcilable with any interpretation other than the deliberate intimidation and coercion of a civilian population and a goal of toppling a government. Defendant's attempt to join ISIS followed ISIS's terror campaigns of 2012 and 2013 in Iraq, when it declared it was "Breaking Walls" and targeting Prime Minister Nouri al-Maliki's government. In that time, ISIS attacked Iraqi Security Forces and committed numerous acts of terrorism,

property destruction, and theft of resources it could monetize.[1] By April 2013, ISIS had entered Syria and begun fighting and seizing land from civilians, eventually taking Raqqa. By 2013 ISIS's violence against Muslims was so decried al-Qaeda ("AQ"), another violent terrorist organization, that AQ's leadership commanded that ISIS stop its campaign entirely. Id. ISIS did not.

Defendant attempted to join ISIS in June 2014, just a month after the Secretary of State designated Islamic State of Iraq and the Levant ("ISIL") as a foreign terrorist organization.[2]  He was then on formal notice of ISIS's atrocities.  Because designation of any group involves a proscription on financing, and the United States dollar is the global currency for trade, all designations were covered widely in the international press. Nevertheless, Defendant asserted that when he traveled to Syria, he believed news accounts of ISIS atrocities was false.

Both before and after its designation as a foreign terrorist organization, ISIS destroyed Iraq's Mosul Museum and Iraq's Mosul

---

[1] https://cisac.fsi.stanford.edu/mappingmilitants/profiles/islamic-state#_ftn65.
[2] In his statements, defendant referred to ISIS as ISIL, an older name for ISIS.

Public Library, numerous temples, mosques, and churches, on an invented claim that these important memorials of human history and culture were idolatrous. Cultural sites are recognized by UNESCO and other preservations groups because they exist for the benefit of all mankind and merit global protection from harm. ISIS's effort to destroy these repositories of human records was designed to intimidate civilians, rob them of their collective history, and deprive the world's population of its anthropological records. In similarly destructive fashion, ISIS killed mostly Muslims while professing a desire to create a Muslim paradise. The irony and depravity of this claim was noted by many. For example, referencing only the time period before Defendant attempted to provide material support to ISIS, a report from Stanford University's Center for International Security and Cooperation, citing numerous additional sources, when noted that ISIS's brutality against Muslims caused it to be rejected from even al-Qaeda core:

> AQI also exploited the power vacuum created by the ongoing Syrian Civil War. In April 2013, Baghdadi moved into Syria and rapidly seized territory. During this time, Baghdadi changed the group's name to the Islamic State in Iraq and Syria (ISIS). He also claimed that AQI had created Jabhat al-Nusra (Al-Nusra), a militant opposition group in Syria, and stated that that the two groups had now merged. Both the Al-Nusra leadership and AQ leader

> Zawahiri disputed the merger. Zawahiri dictated that ISIS should limit its operations to Iraq. On June 14, Baghdadi publicly rejected Zawahiri's statement. ISIS continued to operate in Syria, clashing with other Islamist groups and taking additional territory. In January 2014, ISIS captured the strategic Syrian city of Raqqa against the commands of AQ leadership. AQ officially renounced connection with ISIS in February 2014.

https://cisac.fsi.stanford.edu/mappingmilitants/profiles/islamic-state#highlight_text_12412. Likewise, ISIS seized countries' natural resources, such as Iraq's oil wells, and stole money from its populations to funds its exploits. Id. At its height, ISIS was believed to have acquired over $2 million per day from these stolen assets. Id.

### Defendant's Sought to Enter a War Zone Well-Knowing the Conflict Meant Civilians were Being Intimidated, Coerced, and Killed to Topple the Government

In his interview with S.A. David Collins, Defendant said he had a desire to go into dangerous war zones ("danger places"), though he attributed this to being in a manic phase of Bipolar 1. The fact that Defendant wanted to enter ISIS territory while it was engaged in battles with civilians shows that he was not interested in mere peaceful existence in a Caliphate. The Defendant's stated belief that accounts of ISIS atrocities were false, taken alongside his stated desire to travel to a dangerous area in which war was ongoing,

presents an irreconcilable conflict in the Defendant's stated beliefs and actions.

### Defendant's Mental Illness Did Not Deprive Him of Agency

The government submits that Defendant had agency over his decisions when he attempted to join ISIS in an active war zone. Moreover, Defendant made an after-the-fact admission that he was not in a fully manic phase at the time of his crime. "I, I, it wasn't, it wasn't my full fledge manic episode. It was like the beginning, the beginning symptoms." Statement to S.A. Collins, 2018, at 7. Defendant's mental illness, while episodic and serious, did not impair his ability to: plan his travels, create a false story about the purpose of his one-way flights, change flights in Turkey, dispose of his cell phone in Turkey, locate a hotel in Gaziantep, locate a driver, and leave for the border under cover of darkness in the company of others seeking to enter ISIS territory. The sheer amount of planning and deliberation required to carry out his trip to the Syrian border strongly militates in favor of the Court concluding he had agency over his decisions. The government submits that his illness did not interfere with his planning to get smuggled into ISIS territory

undetected and cannot suffice to render him ineligible for the terrorism enhancement.[3]

### The Material Support Defendant Attempted to Provide Would Have Fueled ISIS's Fighting Machine and Its Efforts to Topple Governments

Defendant's own words reveal that he would offer translation services to ISIS's media wing. ISIS's cheap and effective media campaign, broadcast to millions of younger, Internet-savvy individuals, provided it with the troops it needed to topple the Syrian government, including the regional governments in the provinces that ISIS seized. These messages were pushed out by ISIS's media wing and amplified across the globe through social media and communications applications. The result was an epic tragedy, wherein tens of thousands of fighting-age people left their homes and lives to join ISIS's terrible campaign to seize territory and fell governments. "Between 2011 and 2016, over 42,000 foreign fighters travelled to join IS from over 120 countries."[4] Moreover, ISIS's media wing used video depictions of Sharia law punishment, including

---

[3] For example, before he left for Turkey, Defendant even emailed DHS falsely claiming he purchased a one-way ticket to Egypt as a cost-saving measure and was going to visit his sick father and stepsiblings.

[4] https://cisac.fsi.stanford.edu/mappingmilitants/profiles/islamic-state#_ftn65.

assassinations and bombings, as a twisted sales pitch, designed to radicalize and recruit internet-savvy persons of fighting age who were intrigued by such violent imagery, and who tended to live large parts of their lives online. Those same individuals, recruited via the internet, assisted ISIS in taking territory from civilian populations by force. These ISIS media images contained translated texts, distributed by ISIS's media wing, and amplified through social media sharing tools. Sadly, these images brought many English-speaking warriors to the battlefront of Syria. It is highly unlikely that without these fighters ISIS could have advanced into Iraq and Syria. English speaking fighters were radicalized and recruited *because* they could hear and read ISIS's poisonous messages *after they were translated*. Moreover, each person under the jurisdiction of the United States who offered themselves as personnel to ISIS would also be committing a violation of 18 U.S.C. § 2339B. Assisting in ISIS's media campaign would have fueled further violations of the material support statute. Assisting ISIS's media wing with translation services, far from being a benign activity, provided valuable support and was a key tool in

ISIS's recruitment machine that served its goals of toppling governments and intimidating and coercing civilians.

## CONCLUSION

In conclusion, the government respectfully requests that this Court apply U.S.S.G. § 3A1. to Defendant's conduct in the instant case.

Respectfully submitted,

JASON R. COODY
United States Attorney

*/s/David P. Byron*
DAVID P. BYRON
Assistant United States Attorney
Florida Bar No. 0105777
401 SE First Ave, Ste 211
Gainesville, FL 32601
(352) 378-0996
David.byron@usdoj.gov

## LOCAL RULE 7.1 CERTIFICATE

I certify that this paper does not exceed 8,000 words, per Microsoft Word's word count, which complies with the word limit requirements set forth in Local Rule 7.1(F).

*/s/ David P. Byron*
DAVID P. BYRON
Assistant U.S. Attorney